**HEALTHCARE SERVICES, INC., Plaintiff,**

v.

**NATIONAL PRESCRIPTION ADMINISTRATORS, INC., Defendant.**

No. 93–CV–4983.

United States District Court, E.D. Pennsylvania.

Nov. 10, 1994.

Debra Klebanoff, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA, for plaintiff.

Virginia A. Lazala, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for defendant.

### MEMORANDUM AND ORDER

JOYNER, District Judge.

The defendant in this civil matter, National Prescription Administrators, Inc. (NPA), has brought a motion seeking an order granting it summary judgment on all counts of the Plaintiff's complaint as well as an order awarding it costs and attorney's fees pursuant to Rule 11 of the Federal Rules of Civil Procedure. For the reasons outlined below, the motion will be denied in part and granted in part.

## I. HISTORY OF THE CASE

The plaintiff in this diversity case, Healthcare Services, Inc. (HCS), is a Delaware corporation engaged in the business of filling medical prescriptions by mail order. The defendant NPA is a New Jersey corporation that provides prescription program administration services to certain companies and other entities. In 1983, NPA and HCS entered into a contract (HCS/NPA agreement) by which HCS agreed to join NPA's network of companies willing to fill prescriptions for companies with employee prescription plans. In 1990, NPA entered into a written contract (Pan Am/NPA agreement) with Pan American World Airlines, Inc. (Pan Am), a wholly owned subsidiary of Pan American Corporation. Pursuant to this contract, NPA agreed to provide prescription administrative services to Pan Am.

The relationship between the three companies operated as follows. HCS filled prescriptions for Pan Am's employee prescription plan and then submitted claims to NPA for reimbursement. NPA would review the claims in order to insure that the claims conformed to Pan Am's billing guidelines. Following review, NPA would report the non-conforming claims to HCS and submit to Pan Am a billing report for all valid claims, indicating the amount owed to HCS. Pan Am would then transfer monies to NPA to cover both NPA's services and the reimbursement of HCS's claims. Finally, NPA

would reimburse HCS for the valid claims out of funds received from Pan Am. NPA would only provide payment to HCS after receiving funds from Pan Am.

In the late summer and fall of 1991, NPA rejected a large number of claims submitted by HCS.[1] When HCS contacted NPA to inquire about the large number of rejected claims, NPA instructed HCS to resubmit the claims. HCS sent the first of its resubmissions on November 25. The vast majority of these claims were eventually approved at various times during late November and December of 1991 and January of the following year. However, on December 4, 1991, Pan Am ceased all business operations and informed HCS that it could not fill any more prescriptions. Soon thereafter, Pan Am contacted HCS directly to ensure that HCS would continue to ship prescriptions to Pan Am employees. HCS agreed to continue to provide services on condition that Pan Am send an advance payment of $155,000 directly to HCS. This amount, intended to be a prepayment for future services, was sent to HCS on December 6, 1991.

Meanwhile, HCS and Pan Am entered into direct negotiations to resolve the issue of the outstanding claims. HCS allowed the claims to be processed by NPA, but it sought payment from Pan Am directly. On or about January 9, 1992, Pan Am agreed to make a direct payment to HCS for a number of claims amounting to approximately $913,000. Pan Am's vice president of finance requested funds to finance this payment on January 21, 1992, but Pan Am refused to make the payment, opting instead to allow those obligations to be resolved through the bankruptcy process. Later, Pan Am offered HCS 50 cents on the dollar to satisfy its claim, but HCS did not accept this offer.

In September of 1993, HCS filed its complaint, asserting an entitlement to relief under the theories of breach of contract, promissory estoppel, and negligence. The essence of HCS's complaint is that HCS failed to receive payment as a direct result NPA's improper rejection of the claims for reimbursement. NPA answers these allegations by stating that it was contractually bound to

transfer funds to HCS only after it received payment from Pan Am. Since both parties agree that Pan Am never paid NPA, NPA never became obligated to make payment to HCS and, as a result, it is entitled to an award of summary judgment. Further, NPA contends that by entering into direct negotiations with Pan Am, HCS essentially waived any claim it had against NPA. The Court holds that issues of fact exist as to whether NPA breached its contract with HCS by mishandling the claims and as to whether HCS was harmed as a result. As a result of this disposition, this Court further holds that NPA's motion for Rule 11 sanctions must be denied.

## II. DISCUSSION

### A. The Summary Judgment Standard

This Court is authorized to award summary judgment "if the pleadings, depositions, ... on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the Court's responsibility is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of W. Chester,* 891 F.2d 458, 460 (3d Cir.1989) (citing *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510). Further, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). Boiled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. at 2512. With these principles in mind, the Court turns to HCS's complaint.

---

1. HCS contends that the amount of claims improperly rejected by NPA totals $621,486.61.

## B. *Breach of Contract*

Counts I and II of HCS's complaint allege that NPA is liable to HCS under a breach of contract theory. Count I asserts that HCS is entitled to relief as a third party beneficiary of the Pan Am/NPA agreement, while Count II alleges that NPA breached the HCS/NPA agreement.

### 1. *Third Party Beneficiary Theory*

■ HCS's complaint seeks relief under the theory that HCS is a third party beneficiary of the Pan Am/NPA agreement. NPA argues that HCS is merely an incidental beneficiary of the Pan Am/NPA contract, and as such, it has no standing to sue under that agreement. Under applicable law,[2] a third party beneficiary is one for whose benefit a contract is made, such that he may enforce it in the courts. *Werrmann v. Aratusa, Ltd.,* 266 N.J.Super. 471, 476, 630 A.2d 302, 305 (App.Div.1993). Thus, New Jersey courts have held that "[t]he essence of contract liability to a third party is that the contract be made for the benefit of said third party within the intent and contemplation of the contracting parties." *Gold Mills, Inc. v. Orbit Processing Corp.,* 121 N.J. Super 370, 373, 297 A.2d 203, 204 (Law Div.1972), *quoted in Air Master Sales Co. v. Northbridge Park Co-op., Inc.,* 748 F.Supp. 1110, 1117 (D.N.J. 1990). The key inquiry, therefore, is whether the parties intended, at the time of contracting, that some third party should acquire a right of performance. *Grant v. Coca–Cola Bottling Co.,* 780 F.Supp. 246, 249 (D.N.J.1991); *see Air Master Sales,* 748 F.Supp. at 1117 ("New Jersey courts have been hesitant to imply a third-party beneficiary obligation unless the parties explicitly indicate that (1) the claimant is an intended beneficiary of the proposed arrangement and (2) that the claimant will have a direct claim under the contract.").

By applying these rules, New Jersey courts have held that a restaurant patron was a third party beneficiary of an agreement between the restaurant owner and its insurance agent to procure coverage. *Werrmann,* 630 A.2d at 305. Although the plaintiff was not identified in the agreement, the court justified its conclusion by reasoning that an innocent third party expects that some source of compensation for injury will be available. *Id.* at 305–06. Further, in *Broadway Maintenance Corp. v. Rutgers, State Univ.,* 180 N.J.Super. 350, 434 A.2d 1125 (App.Div.1981), *aff'd,* 90 N.J. 253, 447 A.2d 906 (1982), a New Jersey appellate court held that each of six construction contractors were intended beneficiaries of the contracts between Rutgers and the other contractors. *Broadway,* 434 A.2d at 1129. In reaching its decision, the court looked to the language of the contracts, which provided that the contractors were to coordinate their efforts. The court therefore allowed the contractors to sue the one contractor who failed to perform, since each contractor benefitted from the performance of the others, and each "had a direct stake in the performance of all other contracts." *Id.*

On the other hand, a court applying New Jersey law concluded that a glass manufacturer was merely an incidental beneficiary of a contract between a window installer and an apartment complex owner, even though the contract specifically provided for the use of the glass manufacturer's product. *Air Master Sales,* 748 F.Supp. at 1117. In explaining its rationale, the court noted that the contract "does not indicate in any way that [plaintiff] was to be a beneficiary of the proposed arrangement nor does it state that [plaintiff] will have any claim under the contract." *Id.* In a similar decision, the United States Court of Appeals for the Third Circuit concluded that, under New Jersey law, a ventilation system manufacturer was not an intended beneficiary of a contract between a general contractor and a subcontractor that called for the installation of the plaintiff's equipment. *Dravo Corp. v. Robert B. Kerris, Inc.,* 655 F.2d 503, 510 (3d Cir.1981). The *Dravo* court noted that the plaintiff's interests were sufficiently protected by its agreement with the subcontractor, and that the intention of the parties was most probably for the plaintiff to collect under this agreement. *Id.*

■ Upon review of the foregoing, this Court concludes that Pan Am and NPA did

**2.** For purposes of this motion, the parties agree that New Jersey law applies.

not enter into their agreement for the benefit of HCS. As a result, HCS cannot sue NPA as a third party beneficiary of that agreement. While the contract provides that NPA is to reimburse providers, such as HCS, for all valid prescriptions, there is no indication that the parties entered into the contract with the purpose of benefiting prescription providers. Moreover, there is no evidence to suggest that NPA and Pan Am intended to allow HCS or any other provider to enforce the agreement. Indeed, the fact that HCS had negotiated a contractual arrangement directly with NPA suggests that HCS and NPA intended that the NPA/HCS agreement would govern disputes between those parties. *Dravo,* 655 F.2d at 510; *see Air Master Sales,* 748 F.Supp. at 1118 (evidence that glass manufacturer sought to establish contractual relationship with homebuilder suggests that glass manufacturer is not intended beneficiary of contract between homebuilder and glass installer). Accordingly, NPA's summary judgment motion with respect to the third party beneficiary claim will be granted.

### 2. *Breach of the HCS/NPA Agreement*

HCS also argues that it has presented a proper claim against NPA for its alleged breach of the HCS/NPA agreement. To support this assertion, HCS contends that NPA was under a contractual duty to process valid claims and submit them to Pan Am for payment. HCS argues that NPA improperly rejected a large number of valid claims, and that by the time NPA corrected its mistakes, Pan Am had ceased to honor any debts. But for NPA's improper rejection of the claims, HCS's argument concludes, HCS would have been reimbursed before Pan Am filed for bankruptcy protection.

■ Upon review of the evidence presented, this Court finds that, pursuant to Article II of the HCS/NPA agreement, NPA was required not only to "[r]eceive and process invoices presented by [HCS] on Claim Forms," but also to "[r]eimburse [HCS] . . . within thirty (30) days of receipt." This language imbues NPA with a contractual duty to process valid claims submitted by HCS and forward them to Pan Am, thereby allowing HCS to be compensated for its services. This Court further concludes that an issue of fact has been raised as to whether NPA rejected a number of claims that should have been approved, in violation of the HCS/NPA contract. The fact that the great majority of the rejected claims were approved after they were resubmitted is evidence that the claims were valid all along.[3] Accordingly, NPA will prevail at the summary judgment stage only if it can show that its alleged breach is unrelated to HCS's loss.

In an effort to make this showing, NPA offers two arguments. First, NPA cites *American Handkerchief Corp. v. Frannat Realty Co.,* 17 N.J. 12, 20, 109 A.2d 793, 797 (1954), and contends that its performance was excused because a condition precedent to its performance had not been satisfied. NPA correctly notes that it was under no obligation to reimburse HCS until it had received funds from Pan Am; and since it had not received those funds, its failure to make payment to HCS was excused. NPA's argument misses the point, however, since HCS alleges a breach based upon NPA's alleged mishandling of the claims, and not upon an allegation that NPA is wrongfully withholding funds for reimbursement received from Pan Am.

■ Second, NPA invokes the doctrine of election of remedies and contends that even if NPA did breach the HCS/NPA agreement, HCS waived any action that it might have had when it elected to negotiate with Pan Am directly in order to secure payment. A New Jersey court has described the election of remedies doctrine as follows:

> "where a party injured by a breach definitely manifests a choice of a remedy that is actually available to him, in the place of some other alternative remedy, such a

---

**3.** It does little good for NPA to argue, as it does, that it must prevail on this issue because the vast majority of disputed claims were eventually approved. Since a great number of the claims were approved after December 4, there remains a question as to whether the delay in approval caused HCS's loss. Accordingly, NPA's motion for summary judgment cannot be granted on this ground.

manifestation will bar an action for the latter remedy, provided that the party against whom the remedy is asked makes a substantial change of position in reliance on the manifestation of intention before notice of its retraction. This makes the conclusiveness of an 'election' depend upon the existence of facts sufficient to create an 'estoppel.' ... The mere bringing of a suit asking one remedy rather than another practically never affords ground for an estoppel and is not sufficient reason to deny an application for an alternative remedy."

*Newark Paraffine Paper Co. v. Dugan,* 162 N.J. Super 575, 577–78, 394 A.2d 114, 115 (App.Div.1978) (quoting 5A Corbin, *Contracts,* § 1220 at 461–65 (1964)). Thus, a litigant may not invoke a remedy inconsistent with an alternative remedy previously invoked. *See Evcco Leasing Corp. v. Ace Trucking Co.,* 828 F.2d 188, 195 (3d Cir.1987) (noting that election of remedies refers to a choice made "between two alternative and inconsistent rights").

 NPA's argument with respect to election of remedies must be rejected, at the outset, because there is nothing legally inconsistent between the two paths HCS could have taken to achieve satisfaction of its claims. In short, there is no precedent to support the notion that HCS foreclosed any contractual action it had against NPA merely by entering into direct negotiations with Pan Am. Further, even if HCS's options could be construed as inconsistent remedies, there is no evidence to suggest that it "elected" one of them for purposes of the doctrine. Election generally requires much more than merely pursuing, through negotiation, satisfaction of a debt. *See Newark Paraffine,* 394 A.2d at 115 ("bringing of a suit asking one remedy rather than another practically never affords ground ... to deny an application for an alternative remedy" (citation omitted)).

This Court finds that disputed issues of fact exist as to whether NPA mishandled the claims in breach of the HCS/NPA agreement and whether HCS was harmed as a result. Moreover, NPA has failed to demonstrate that it is entitled to judgment as a matter of law. Accordingly, its summary judgment motion with respect to Count II of HCS's complaint will be denied.

### C. *Alternative Claims*

HCS also raises, as alternative claims, causes of action based upon promissory estoppel and negligence. Because the facts on the record do not support either theory, NPA's motion for summary judgment as to Counts III and IV will be granted.

#### 1. *Promissory Estoppel*

 HCS asserts that it is entitled to recovery under a promissory estoppel theory. The promissory estoppel doctrine allows a court to enforce a party's promise in order to prevent unfairness in situations where there is an absence of consideration. *International Minerals & Mining Corp. v. Citicorp N. Am.,* 736 F.Supp. 587, 600 (D.N.J.1990). Thus, promissory estoppel is usually applicable only when there is no enforceable contract. *Carlson v. Arnot–Ogden Memorial Hosp.,* 918 F.2d 411, 416 (3d Cir.1990). In order to make out a prima facie case under this theory, therefore, a party must demonstrate the existence of (1) a definite promise by the promisor, (2) made with the expectation that the promisee will rely on the promise, (3) actual reliance by the promisee, and (4) some detriment incurred as a result of reliance. *Ballard v. Schoenberg,* 224 N.J.Super. 661, 541 A.2d 258, 260–61 (App.Div.), *certification denied,* 113 N.J. 367, 550 A.2d 473 (1988).

 HCS argues that its promissory estoppel theory is supported by NPA's "promise" to HCS that it would receive payment if it allowed its claims to be processed through NPA; and that by submitting its claims through NPA, HCS relied on NPA's promise, to its detriment. This Court concludes, however, that HCS's argument lacks merit. In the first instance, the two agreements that govern the relationship between Pan Am, NPA, and HCS are enforceable agreements supported by consideration. Pan Am receives pharmaceutical products in exchange for cash payments. NPA receives cash in exchange for its administrative services. And HCS receives cash in exchange for its products. Further, the "promise" that, according to HCS, triggers the application of

the doctrine is not some unbargained-for overture upon which HCS detrimentally relied, but is instead the manner of performance called for in the agreements. Accordingly, the facts alleged by HCS do not support the application of the promissory estoppel doctrine, and as a result, NPA's motion for summary judgment on this count will be granted.

### 2. Negligence Theory

The final theory of liability asserted by HCS is that NPA processed the claims in a negligent manner, and is liable to HCS as a result. HCS's argument reflects an attempt to recast this contract action as a tort case. New Jersey courts have commented on the often indistinct line between duties arising in tort and contract. *Spring Motors Distribs. v. Ford Motor Co.*, 98 N.J. 555, 489 A.2d 660, 672 (1985); *New Mea Constr. Corp. v. Harper*, 203 N.J.Super. 486, 497 A.2d 534, 538 (App.Div.1985). One line of distinction, however, appears in the interests protected by each area of the law. The Supreme Court of New Jersey has explained this distinction as follows: "The purpose of a tort duty of care is to protect society's interest in freedom from harm, *i.e.*, the duty arises from policy considerations formed without reference to any agreement between the parties. A contractual duty, by comparison, arises from society's interest in the performance of promises." *Spring Motors*, 489 A.2d at 672. Accordingly, the majority of courts have denied relief under a negligence theory to plaintiffs whose economic expectations have been frustrated. *Id.* at 673; *See People Express Airlines v. Consolidated Rail Corp.*, 100 N.J. 246, 495 A.2d 107, 109 (1985) (negligence actions seeking recovery solely for economic losses will not lie).

While HCS concedes that negligence actions cannot normally be maintained to recover economic losses, it argues that a plaintiff can properly proceed under a negligence theory in situations where the law imposes a duty of care upon the defendant. To support this contention, HCS cites *Carter Lincoln-*

*Mercury v. EMAR Group*, 135 N.J. 182, 638 A.2d 1288 (1994), wherein the court held that an insurance broker and agent owed a duty to an insured to procure insurance with a financially stable insurer. *Id.* 638 A.2d at 1298. The *Carter Lincoln–Mercury* court based its decision on the long-standing common law duty of care that an insurance agent owes to an insured. *Id.* at 1291 (citations omitted).[4] Further, the court recognized a duty of care because of the foreseeability that an insured would suffer harm as a result of an agent's failure to obtain insurance with a solvent carrier. *Id.* at 1296–97.

Relying on *Carter Lincoln–Mercury*, HCS argues that NPA owed a duty of care to HCS because it should have been foreseeable that HCS would suffer harm if NPA failed to process HCS's claims properly. This Court concludes, however, that this case is more appropriately suited to the application of contract principles than for resolution under a tort theory. First, in the instant case, there is no principal/agent relationship between HCS and NPA, as there was in *Carter Lincoln–Mercury*. *Id.* at 1291. Accordingly, there is no special relationship between NPA and HCS that justifies the imposition of a legal duty. Moreover, NPA's duty to process valid claims is not a duty imposed by law, but is instead imposed by agreement of the parties involved. As such, it is clearly a contractual duty, one that is subject to analysis by the application of contract principles. Finally, since it will always be "foreseeable" that harm will come to non-breaching party in the ordinary contractual setting, to impose a duty of care upon contracting parties as a general measure and allow non-breaching parties to recover in tort would be to transform every breach of contract action into a tort case. Such a result would consume much of contract law. Accordingly, NPA's summary judgment motion with respect to the negligence claim will be granted.

### III. CONCLUSION

Because HCS has presented this Court with disputed issues of fact concerning

---

4. The court noted, more generally, that it was "appropriate to impose a duty on tortfeasors who by virtue of their activities, training, or preparation for their work had particular knowledge or reason to know that others would be harmed by their negligent conduct." *Id.* at 1294 (citation omitted).

whether NPA breached its contract with HCS and whether HCS suffered a loss as a result, NPA's motion for summary judgment will be denied as to Count II of the complaint. In view of this conclusion, NPA's motion for Rule 11 sanctions is likewise denied.[5] In all other respects, NPA's motion for summary judgment will be granted. An appropriate order follows.

---

5. NPA's motion for Rule 11 sanctions is grounded in its contention that the HCS's complaint lacks any factual basis. Because this Court concludes that there is a sufficient set of facts on the record to support HCS's breach of contract claim, NPA's Rule 11 motion must be denied.